# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ELIZABETH WATTS,        :
                           :
         Plaintiff,       :
                           :
       v.                :    C. A. No. 1:06-CV-00165-GMS
                           :
LOIS J. DAWSON, ESQUIRE    :
                           :
         Defendant.      :

## DEFENDANT'S REPLY BRIEF
## IN SUPPORT OF ITS MOTION TO COMPEL DISCOVERY

**MARKS, O'NEILL,
O'BRIEN & COURTNEY, P.C.**

     **/s/ Theodore J. Segletes, III**
Norman H. Brooks, Jr., Esquire (ID No. 2568)
Theodore J. Segletes, III, Esquire (ID No. 4456)
Marks, O'Neill, O'Brien & Courtney, P.C.
913 North Market Street, #800
Wilmington, DE 19801
(302) 658-6538

*Attorneys for Defendant
Lois J. Dawson, Esq.*

DATED: January 12, 2007

DE074073.1

# TABLE OF CONTENTS

TABLE OF CITATIONS..................................................................................................... ii

I.  SUMMARY OF RELEVANT FACTS AND PROCEDURAL HISTORY............................ 1

II. SUMMARY OF THE ARGUMENT................................................................................. 1

III. ARGUMENT................................................................................................................ 2

        A.      THE COURT SHOULD GRANT DEFENDANT'S MOTION TO COMPEL
                THE RULE 35 EXAMINATIONS................................................................. 2

        B.      THE COURT SHOULD ORDER PLAINTIFF
                TO IDENTIFY HER LEGAL EXPERT........................................................ 4

        C.      THE COURT SHOULD DENY PLAINTIFF'S REQUEST
                FOR RULE 11 SANCTIONS......................................................................... 5

IV. CONCLUSION............................................................................................................. 5

i

## TABLE OF CITATIONS

**Federal and State Cases**

*Jefferys v. LRP Publications, Inc., et al.*, 184 F.R.D. 262 (E.D Pa., 1999)................................. 3

*Womack v. Stevens Transp., Inc.*, 205 FRD 445 (ED Pa. 2001).................................................. 3

*Connor v. Barnhart*, 85 Soc. Sec. Rep. Service 176 (ED Pa. 2003)............................................ 4

**Federal Rules**

*Fed. R. Civ. P.* 26(a)(5)................................................................................................................ 2

*Fed. R. Civ. P.* 37(a)(2)................................................................................................................ 2

*Fed. R. Civ. P.* 35(a)............................................................................................................... 2, 3

*Fed. R. Civ. P.* 11(c)(1)(A)........................................................................................................... 5

*Fed. R. Civ. P.* 11(d).................................................................................................................... 5

**Local District Court Civil Rules**

Local Rule 7.1.1............................................................................................................................. 2

**State Statutes**

24 <u>Del. C</u>. § 2605...................................................................................................................... 3

ii

**I.  SUMMARY OF RELEVANT FACTS AND PROCEDURAL HISTORY**

On January 5, 2002, Plaintiff electronically filed and served a Memorandum of Law in Opposition to Defendant's Motion to Compel and Opening Brief in support[1].  Defendant relies on the facts as submitted in her Motion and Opening Brief in support.  Defendant further requests an oral argument on this motion.

**II.  SUMMARY OF THE ARGUMENT**

A.    **THE COURT SHOULD GRANT DEFENDANT'S MOTION TO COMPEL THE RULE 35 EXAMINATIONS**

B.    **THE COURT SHOULD ORDER PLAINTIFF TO IDENTIFY HER LEGAL EXPERT**

C.    **THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR RULE 11 SANCTIONS**

---

[1] Defendant highlights for the Court the fact that there is in place no agreement between the parties that would allow Plaintiff's counsel to proceed in this matter in any manner other than by Brief.  Certainly a weighty allegation of a violation of Rule 11 warrants a more thorough analysis than afforded by Plaintiff's counsel here.

## III.  ARGUMENT

**A.    THE COURT SHOULD GRANT DEFENDANT'S MOTION TO COMPEL THE RULE 35 EXAMINATIONS**

The parties agree that a Rule 35 Order must be pursued *to compel* a party to submit to a mental or physical examination. Specifically, when the mental or physical condition of a party is in controversy, the Court may order such examinations, including Functional Capacity Examinations and Vocational Rehabilitation Evaluations, upon a showing of good cause by the movant [2].  Plaintiff would have the Court deny Defendant's motion on the basis that no Rule 35 motion has ever been filed by the Defendant, or in the alternative, that the motion before the Court fails to establish good cause.  In response, the Defendant notes that her motion is in fact actually before the Court *pursuant to Rule 35*.

Plaintiff complains about Defendant's pre-motion efforts to schedule these examinations, including her use of a filing entitled "Notice of Demand for a Functional Capacity Exam."  This notice was filed for informational purposes, notifying *the Court* that the Defendant was attempting to pursue non-judicial means of securing the exam.  Defendant understood from the Court's September 14, 2006 teleconference with counsel that the Court wanted the parties to pursue such discovery without Court intervention and to keep the Court appraised of their efforts.  Moreover, *Fed. R. Civ. P.* 26(a)(5), entitled "Methods to Discover Additional Matter" clearly authorizes Defendant to "obtain discovery by . . . physical and mental examinations . . . ."  Plaintiff counsel has not and can not identify any authority that *requires* a party to seek judicial intervention to avail itself of this method of discovery.

In fact, the Federal Rules of Civil Procedure and the Local Rules of this Court demonstrate a preference on the part of the judiciary that parties confer and agree on discovery matters *before* seeking judicial intervention[3].  Civil Rule 35 maps out the manner in which a party who has been unable to secure

---

[2] Note *Fed. R. Civ. P.* 35(a), and cases cited by Defendant in her Opening Brief.

[3]  *Fed. R. Civ. P.* 37(a)(2); Local Rule 7.1.1

a physical or mental examination without judicial intervention may secure an Order directing a party to submit to such examination. As such, the Rules empower the Court to act in discovery matters without mandating its intervention.

Being faced with a properly filed Rule 35 motion, Plaintiff's counsel apparently concedes that Plaintiff's mental or physical condition is in controversy, satisfying the first prong of the Court's three prong test to determine whether to Order either of the Rule 35 examinations[4]. To satisfy the second prong, Defendant must demonstrate "good cause" for the examinations. To satisfy the third prong, Defendant must simply show that the examiner is a "suitably licensed or certified examiner."[5]

"Good cause" for a Rule 35 examination exists if the Defendant demonstrates that the examination could adduce specific facts relevant to cause of action and is necessary to the Defendant's case[6]. Plaintiff has likewise not challenged Defendant's showing that good cause exists for an Order directing Plaintiff to submit to a Functional Capacity Examination.

Plaintiff attempts to distinguish Defendant's reliance on *Jefferys v. LRP Publications, Inc.*, 184 FRD 2d 262 (ED Pa. 1999). Although the facts of that case are not identical, it nonetheless represents good law in the Third Circuit for the premise that Vocational Rehabilitation Examinations are a viable subject for a Rule 35 Order. Plaintiff further cites to *Millius v. Tillman*, 2006 WL 1579081 (Del. Super. 1999) for the premise that "essential fairness" constitutes good cause for ordering a Vocational Rehabilitation Examination. Although essential fairness is *one way* to demonstrate good cause, it is not exclusive and the Court's role is to determine whether the examination could adduce specific facts relevant to cause of action,

---

[4] In responding to Defendant's Opening Brief, Plaintiff fails to raise any specific objection, or otherwise question Defendant's assertion, that Plaintiff's mental and physical conditions are in controversy.

[5] *Fed. R. Civ. P.* 35(a)

[6] *Womack v Stevens Transp., Inc.*, 205 F.R.D. 445, 447 (E.D. Pa. 2001).

and is necessary to the Defendant's case[7]. Here, the entire purpose of a Vocational Rehabilitation Examination is to determine those vocations that may be available to Plaintiff, if any. Clearly, this represents specific facts that are both relevant and necessary to the defense.

Having shown good cause to subject Plaintiff to a Vocational Rehabilitation Evaluation, the only question is the qualifications of the examiner. Plaintiff admits that Defendant's vocational expert is properly credentialed[8] but questions Ms. Galper's credentials. Ms. Galper is Vice-President of Clinical Program Development at IMX Medical Management Services, an organization specializing in the performance of Functional Capacity and similar examinations.[9] She is a licensed Physical Therapist, who holds a Master's Degree in Education and whose credentials were sufficient for the District Court for the Eastern District of Pennsylvania where a party's ability to work was at issue.[10]

Having met its burden with regard to both Rule 35 exams, Defendant respectfully requests this Honorable Court it issue an order compelling Plaintiff to submit (1) to a Functional Capacity Examination by and at the office of Jill Galper, P.T., M.Ed. located at 3411 Silverside Road, The Weldin Building, Suite 102, Wilmington, DE 19810 and (2) to a Vocational Rehabilitation Evaluation by and at the office of Rosalyn Peirce, Certified Vocational Expert, located at Two Penn Center, Suite 1050, Phila., PA 19102.

## B.    THE COURT SHOULD ORDER PLAINTIFF TO IDENTIFY HER LEGAL EXPERT

With regard to disclosing the identity of Plaintiff's expert, Plaintiff's counsel once again notes the obvious but misses the point. Defendant's motion arises out of this Court's direction during the September 14, 2006 teleconference. The Court was very clear as to the obligations of the parties in preparation for

---

[7] *Id.*

[8] For supplementary purposes, Defendant attached the examiner's curriculum vitae as Exhibit A.

[9] See materials from the IMX internet web-site attached as Exhibit B.

[10] See *Connor v. Barnhart*, 85 Soc. Sec. Rep. Service 176, *5-*6 (ED Pa. 2003); attached as Exhibit C.

submitting their mediation memoranda on January 16. Those obligations included designation of this expert. Why else would the court have spent so much of its time making the point?

## C.    THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR RULE 11 SANCTIONS

By now the Court is well aware of Plaintiff attorney's cavalier attitude toward the threat and pursuit of Rule 11 sanctions. Rather than waste a significant amount of the Court's time dealing with a clearly frivolous claim for sanctions, Defendant's counsel wishes to highlight simply this:

(1) Rule 11 sanctions do not apply to discovery issues;[11]

(2) A Rule 11 motion must be made separately from other motions or requests;[12] and

(3) A Rule 11 motion must be served upon the party to whom it is directed and that party must be given 21 days to address the issue.[13]

Thus, Rule 11 sanctions are not available to Plaintiff counsel on this motion. Assuming *arguendo* they were, Plaintiff counsel's motion has not been made separately nor has it been served on Defendant's counsel and Defendant's counsel given 21 days to address the matter. Moreover, as Defendant's Motion to Compel is clearly warranted given Plaintiff's actions, there is no basis for sanctioning Defendant or her counsel under any other Rule.

## IV.  CONCLUSION

Plaintiff has concedes that her physical and mental condition are in controversy. She concedes that there is good cause for Defendant to pursue a Functional Capacity Exam of her and she concedes that Defendant's vocational rehabilitation examiner is properly credentialed. Defendant has demonstrated that

---

[11] *Fed. R. Civ. P.* 11(d)

[12] *Fed. R. Civ. P.* 11(c)(1)(A)

[13] *Id.*

DE074073.1                                    -5-

good cause exists for a Vocational Rehabilitation Evaluation of Plaintiff and that her examiners are properly credentialed, certified and/or licensed to conduct the Rule 35 exams Defendant seeks.  Thus, Defendant requests the Court to order the Rule 35 Examinations.

The Court has previously directed Plaintiff to disclose the identity of her legal expert so Defendant can depose him/her.  Plaintiff counsel has repeatedly refused to do so.  Thus, Defendant requests the Court to order such identification.

For the foregoing reasons, the Defendant, by and through her undersigned counsel, respectfully requests that the Court GRANT her Motion to Compel Discovery.

> **MARKS, O'NEILL,**
> **O'BRIEN & COURTNEY, P.C.**
>
> ___/s/ Theodore J. Segletes, III_____
> Norman H. Brooks, Jr., Esquire (ID No. 2568)
> Theodore J. Segletes, III, Esquire (ID No. 4456)
> Marks, O'Neill, O'Brien & Courtney, P.C.
> 913 North Market Street, #800
> Wilmington, DE 19801
> (302) 658-6538
>
> *Attorneys for Defendant*
> *Lois J. Dawson, Esq.*

DATED: January 12, 2007

**EXHIBIT A**

**EXHIBIT A**

**EXHIBIT A**

**EXHIBIT A**

**EXHIBIT A**

**EXHIBIT A**

**EXHIBIT A**

**EXHIBIT A**



# ROSALYN PIERCE

## EDUCATION

Nova Southeastern University, Fort Lauderdale, FL 33314
Conflict Resolution & Analysis, 9/06 – present

The University of Maryland, College Park, MD 20742
Master of Arts, Rehabilitation Counseling, August 1975

The Pennsylvania State University, University Park, PA 16082
Bachelor of Science, Rehabilitation Counseling, August 1973

C.R.C., C.D.M.S., N.C.C., C.C.M., A.B.V.E. (Diplomate), and Licensed
Professional Counselor in the Commonwealth of Pennsylvania.

## TRAINING

- The Pennsylvania and New Jersey Chapters of International Association of
  Rehabilitation Professionals Spring Conference, June 2006; 13 Continuing
  Education Credits

- The American Board of Vocational Experts Spring Conference, March 2006;
  14.75 Continuing Education Credits

- Pennsylvania and New Jersey Chapters of International Association of
  Rehabilitation Professionals Spring Conference, June 2005; 13 Continuing
  Education Credits

- The Pennsylvania and New Jersey Chapters of International Association of
  Rehabilitation Professionals Spring Conference, June 2005; 13 Continuing
  Education Credits

- The International Association of Rehabilitation Professionals Spring
  Conference, April 2005; 16 Continuing Education Units

- The American Board of Vocational Experts Spring Conference, March 2005;
  12.75 Continuing Education Credits

- The American Board of Vocational Experts Fall Conference, October 2004;
  14.5 Continuing Education Hours

- The American Board of Vocational Experts Annual Fall Conference, October
  2003; 14.25 Continuing Education Credits



- The Pennsylvania and New Jersey Chapters of International Association of Rehabilitation Professionals Spring Conference, May 2003; 15 Continuing Education Units

- International Association of Rehabilitation Professionals, Forensic Section Conference, December 2002; 12.25 Continuing Education Hours

- The American Board of Vocational Experts Spring Conference, March 2002; 9.5 Continuing Education Credits

- The Pennsylvania and New Jersey Chapters of International Association of Rehabilitation Professionals Spring Conference, May 2002; 17 Continuing Education Hours

- International Association of Rehabilitation Professionals, Forensic Section Conference, December 2001; 8.5 Continuing Education Credits

- The Pennsylvania and New Jersey Chapters of International Association of Rehabilitation Professionals Spring Conference, May 2001; 17 Continuing Education Credits

- The American Board of Vocational Experts Spring Conference, March 2001; 14 Continuing Education Units

- The Pennsylvania and New Jersey Chapters of International Association of Rehabilitation Professionals Annual Conference, May 2000; 17 Continuing Education Credits

- The American Board of Vocational Experts Spring Conference, April 2000; 15.5 Continuing Education Credits

- The American Board of Vocational Experts Fall Conference, October 1999; 15 Continuing Education Hours

- The Pennsylvania Chapter of National Association of Rehabilitation Professionals in the Private Sector; 11th Annual Conference – Law & Order,

- April, 1999
- 5th Annual National Conference of Expert Witnesses, Litigation Consultants and Attorneys, November 1998; 22 Continuing Education Units



- The American Board of Vocational Experts Fall Conference, October 1998; 13 Continuing Education Units

- The 14th Annual National Conference of Expert Witnesses, Litigation Consultants and Attorneys, November, 1997; 22 Continuing Education Hours

- The American Board of Vocational Experts Seminar, March 1997; 14 Continuing Education Credits

- The American Board of Vocational Experts Fall Conference, October 1996; 13 Continuing Education Units

- The Pennsylvania Chapter of National Association of Rehabilitation Professionals in the Private Sector; "The New Worker's Compensation Law." 1 Contact Hour, September 1996

- The Office Worker's Compensation, U.S. Department of Labor; Rehabilitation Counseling Certification Training; May 1996; 16 Continuing Education Credits

- The American Board of Vocational Experts Spring Conference, March 1996; 12 Continuing Education Hours

- The Medical Case Management Convention; Division of Continuing Education and Training, October 1995; 22 Continuing Education Units

- National Rehabilitation Counselor Association Seminars, February 1993

- Risk Management Seminar sponsored by Proclaims, Inc., November 1992

- Licensed Professional Counselor

## EMPLOYMENT HISTORY

**11/00–Present Adjunct Instructor–The Pennsylvania State University, University Park, PA**
*Introduce undergraduate and graduate students to proprietary rehabilitation specialization.*

**2/00-Present   Guest Lecturer-Temple University, Philadelphia, PA**
*Assist graduating seniors explore their vocational options and employment opportunties*



**4/99-6/00**    **Adjunct Instructor-Peirce College, Philadelphia, PA**
*Teach course on job seeking skills, resume writing, interviewing techniques and entrepreneurship.*

**1/99-Present**    **Vocational Expert, RP Vocational Rehabilitation, LLC**
**Philadelphia, PA**
*Vocational testing, initial assessments, placement, job counseling, coordinate and monitor retraining, and job availability testimony for individuals with Physical, cognitive, and/or emotional impairments. Prepare Vocational Rehabilitation Evaluations that address earning capacity and wage loss.*

**11/88-12/98**    **Director of Rehabilitation/CEO-Target Rehabilitation Co.,**
**Dresher, PA**
*Vocational testing, initial assessments, placement, job counseling, coordinate and monitor retraining, and job availability testimony for individuals with physical and/or emotional impairments. Prepare Vocational Rehabilitation Evaluations that address earning capacity and wage loss. Managed full service rehabilitation company.*

**7/83-11/88**    **Manager, Vocational Supervisor, Rehabilitation Specialist**
*Vocational Rehabilitation Services, Inc., Norristown, PA*
*Coordinate all aspects of reemployment of injured workers. Supervised rehabilitation specialists, medical coordinators and clerical staff; subsequently managed entire office.*

**11/86-Present**    **Vocational Expert, Office of Hearings and Appeals, Department**
**of Health and Human Services, Philadelphia, PA**
*Provide testimony at appeals hearings for SSI & SSD applicants regarding transferable skills, job availability, and employment options.*

**11/84-11/86**    **Placement Coordinator, Adams Associates, Philadelphia, PA**
*Matched qualified job candidates with employment opportunities.*

**2/82-6/83**    **Community Program Developer**
**Faith United Church of Christ, Philadelphia, PA**
*Initiated and monitored vocational, educational, and recreational programs for community. Placed over 75% of candidates. Managed budget over $300,000.*

**1/80-1-81**    **Associate Instructor**
**P.C.A. Domiciliary Care Provider Training Program, Hershey, PA**
*Trained licensed boarding home operators regarding social, emotional, physical, and recreational needs of disabled adults.*



| | |
|---|---|
| **1/77-1/80** | **Supervisor, Philadelphia Corporation for Aging, Philadelphia, PA**<br>*Directed activities of case managers, case aides, and support staff in providing spectrum of service to disabled elderly.* |
| **7/75-1/77** | **Vocational Rehabilitation Therapist**<br>**Einstein CMH/MRC, Philadelphia, PA**<br>*Counseled and placed developmentally disabled adults in jobs and living facilities.* |

## PROFESSIONAL INTERESTS AND ACCOMPLISHMENTS

- Credentials include: Certified Rehabilitation Counselor, Certified Disability Management Specialist, and Certified Case Manager designation awarded by the Commission on Rehabilitation Counselor Certification, Arlington Heights, Illinois. Awarded NCC (Nationally Certified Counselor) by the National Board for Certified Counselors, 5999 Stevenson Avenue, Alexandria, Virginia 23304. A.B.V.E. Diplomate certified by the American Board of Vocational Experts, Topeka, Kansas 66603.

- Elected to Charles R. Drew CMH/MRC Board of Directors. Served on the Executive and Finance committees. Chairperson of the Program for Planning and Evaluation Committee. Elected for two year term as a board member for Stotesbury Homeowners Association. Assistant chairperson of Salem Baptist Church of Jenkintown Trustee Board; Chairperson of Contacts and Lease committee, Advisory Committee Member Penn State Rehabilitation Education Department.

- Selected by Board of Advisors as an Outstanding Young Woman of America Award for 1982.

- Honored as 1999 Mother of the Year; Salem Baptist Church of Jenkintown.

- Commended as a Woman of Distinction of Montgomery County, May 1999.

- Recognized in the National Distinguished Service Registry.

Member in good standing of the American Association of Counseling and Development, National Rehabilitation Association, Philadelphia Chamber of Commerce, American Board of American Board of Vocational Experts. Served as Treasurer President-Elect, President and Past President of International Association for Rehabilitation Professionals, Pennsylvania Chapter. Board member & Chairperson of the Ethics Committee of the American Board of Vocational Experts.



- First Runner Up for the 1997 Madame C.J. Walker Award for Business Achievement, recognized by the Coalition of 100 Black Women, Inc.

- Presented papers at a symposium entitled "Selecting and Evaluating the Rehabilitation Vendor and ADA Implications for Vocational Rehabilitation." Featured speaker for the Pennsylvania Defense Institute on medical and legal aspects of disability determination, January 1998. Speaker at the Pennsylvania Self-Insured Annual Seminar, June 1998.

- Speaker/Panelist at seminar titled "Handling a Social Security Disability Case in Pennsylvania," sponsored by the National Business Institute, February 22, 2000 (Topic: Expert Witnesses in the Social Security Disability Process).

- Speaker at the Spring Conference of the American Board of Vocational Experts, March 20, 2005 titled "Ethics in Forensic Rehabilitation".

- Speaker at the Spring Conference of the International Association of Rehabilitation Professionals, April 15, 2005 titled "Multicultural Issues and Treatment Planning and Case Management".

- Speaker at the Spring Conference of the Pennsylvania and New Jersey International Association of Rehabilitation Professionals, June 10, 2005 titled "Ethics in Rehabilitation Case Management".

- Pierce, R. & Wilson, K. "The Complexity of Vocational Rehabilitation within the Pennsylvania Workers' Compensation System: A Walk on the Judicial Side", RehabPro Vol. 13, No 3 July/August/September 2005

- Presenter at Association of Trial Lawyers of America Minority Caucus Education Program, ATLA Convention Toronto, Canada, July 23, 2005

- Presenter at Association of Trial Lawyers of America Tele-seminar Maximizing Special Damages: The Importance of Vocational Rehabilitation in Establishing and Maximizing Loss Earning/Impaired Earning Capacity, September 22, 2005

- Ethical Question and Answer Column, The Vocational Expert Newsletter, Winter 2006, Vol.22. No.3

- Presenter at National Business Institute Seminar, Advanced Expert Witness Deposition Tactics, July 28, 2006- Effective Cross Examination of a Vocational Expert

**REFERENCES FURNISHED UPON REQUEST**

**EXHIBIT B**

**EXHIBIT B**

**EXHIBIT B**

**EXHIBIT B**

**EXHIBIT B**

**EXHIBIT B**

**EXHIBIT B**

**EXHIBIT B**





**Cooper vs. Schoffstall - 1099 Discoverability**
Click here to read/download this PA Supreme Court Decision



Home    IME Services    DME Services    FCE Services    PT Services    Review Services    Medical Panel    Office Locations    Contact IMX

IMX is the leading provider of independent medical evaluations (IME), peer reviews, chart reviews and other impartial medical review services in the mid-Atlantic region. We serve the needs of Workers' Compensation, Liability, Disability, Auto Insurance Carriers and attorneys. We also work with Human Resources Departments and perform FMLA Medical Certification Evaluations.

As a direct provider of IME's and other Review services, IMX has established a comprehensive panel of leading physician specialists, skilled in rendering an objective, thorough medical analysis of insurance claimants and in delivering depositions.

**NEW FEATURES!**

New to our website is our online deposition request form. To request a deposition, simply click the graphic below.



Deposition Request Form







Browse our selected physicians

Request an IME online

Choose one of our locations

**IMX News**

**Elizabeth Genovese, MD, MBA: Appointments**

**Jill Galper, PT, MEd: Appointments**

⊛ The Social Security Administration's new initiative to improve the overall Disability Determination Process - March 2006 **Chosen as an Expert Panel Consultant**

⊛ AMA Guides to the Evaluation of Permanent Impairment – 6th edition . **Section Editor for the new AMA Guides – 2006**

⊛ **Jill Galper, PT, MEd** has been appointed Treasurer of the PPTA (PA Physical TherapyAssn) Southeast District for the year 2006

⊛ **Publication/Editorial Positions:**
**Co-researcher of "The Effects of At-Work Exercise Programs on Neck and Back Comfort and Pain in Computer Users",** accepted for presentation by the APTA at the national 2004 conference; pending publication in *Work Journal* 2006. (Kietrys DM, Galper JG, Verno, VW)

⊛ **Affiliate Editor of Insights Newsletter.** ACOEM Newsletter for "Insights" (ACOEM Clinical Practice Guidelines Newsletter)

Home    IME Services    DME Services    FCE Services    PT Services    Review Services    Medical Panel    Office Locations    Contact IMX



IMX Medical Management Services - Two Bala Plaza, Suite 600; Bala Cynwyd, PA 19004
Toll free: 800.707.0575, P: 610.667.4463, F: 610.667.4764
Copyright © 2003, IMX Medical Management Services, Inc. All rights reserved.




**MEDICAL MANAGEMENT SERVICES**

Home | IME Services | DME Services | FCE Services | PT Services | Review Services | Medical Panel | Office Locations | Contact IMX

## FCE Services

## What is a Functional Capacity Evaluation?

A Functional Capacity Evaluation is a test utilized most commonly in the area of workers' compensation, and disability, to determine an individual's current physical ability to perform various functional tasks commonly associated with work. This evaluation is an integral tool utilized for determining an individual's functional ability to work after an illness or injury.

## What are the Components of a Functional Capacity Evaluation?

- A client's self-rating of pain and disability through questionnaires and interviews

- A medical history and focused musculoskeletal examination

- Material Handling Tests (lift, carry, push, pull, etc)

- Movement Tests (walking, reaching, climbing, dexterity, etc)

- Positional Tolerance Tests (standing, sitting, etc)

- Evaluation of aerobic conditioning when necessary

- Job specific testing, when the client's ability to return to a specific job is at question.

- Information gleaned from more than one test is often used to assess to what degree a client is or is not providing a good and consistent effort

- A Comprehensive Report that includes An "Estimated Physical Capabilities Form"

## When to order a Functional Capacity Evaluation?

**Workers' Compensation**

- To assess whether an individual can be returned to his/her job of injury. Can he/she safely meet the essential physical functions of his or her job?

- Is the client capable of performing any other work?

- When a client has objective evidence of pathology but appears to be exaggerating their limitations.

- When a client complains of persistent symptoms and limitations despite ongoing care.

**LTD**
- To assess whether a client is "fit for duty" - Used when a client is returning to their "occupation" or "any occupation" after a medical leave.

- Often utilized in combination with an Independent Medical Evaluation

**Post-Offer Functional Testing**
- To evaluate whether a new hire has the physical ability to perform the essential functions of a job that requires a high degree of physical fitness

**FMLA**
- Utilized in conjunction with an Independent Medical Evaluation to assess whether the individual who returns from FMLA leave can perform the essential functions of their job. Also used in medical re-certification of an individual's FMLA leave.

**Independent Medical Evaluation and Functional Capacity Evaluation Combination**
- Can be used in combination with a Independent Medical Evaluation – either a full 3-4 hour evaluation or a 2 hour focused Functional Capacity Evaluation

**Quality Assurance of All Functional Capacity Evaluations**
- Whether our Functional Capacity Evaluations are performed on-site, or by one of our Network of Providers, strict Quality Assurance is performed on every Functional Capacity Evaluation Report by Jill S. Galper, P.T.,M.Ed. - VP of Clinical Program Development.

Home     IME Services     DME Services     FCE Services     PT Services     Review Services     Medical Panel     Office Locations     Contact IMX

IMX Medical Management Services - Two Bala Plaza, Suite 600; Bala Cynwyd, PA  19004
Toll free: 800.707.0575, P: 610.667.4463, F: 610.667.4764
Copyright © 2003, IMX Medical Management Services, Inc. All rights reserved.

**EXHIBIT C**

**EXHIBIT C**

**EXHIBIT C**

**EXHIBIT C**

**EXHIBIT C**

**EXHIBIT C**

**EXHIBIT C**

**EXHIBIT C**

2003 U.S. Dist. LEXIS 143, *; 85 Soc. Sec. Rep. Service 176

2 of 2 DOCUMENTS

**SANDRA L. CONNOR v. JO ANNE B. BARNHART, Commissioner of Social Security**

**CIVIL ACTION NO. 02-009**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2003 U.S. Dist. LEXIS 143; 85 Soc. Sec. Rep. Service 176*

**January 6, 2003, Decided**
**January 6, 2003, Filed; January 7, 2003, Entered**

**DISPOSITION:** Magistrate's report and recommendation disapproved. Motion for summary judgment granted, in part. Judgment entered in favor of plaintiff and against defendant, and case remanded to Commissioner of Social Security.

**COUNSEL:** [*1] For Sandra L Connor, PLAINTIFF: Kenneth M Kapner, Philadelphia, PA USA.

**JUDGES:** Stewart Dalzell, J.

**OPINION BY:** Stewart Dalzell

**OPINION:**

MEMORANDUM

Dalzell, J.

January 6, 2003

Sandra Connor is a fifty-five year old woman in frequent pain with a severe impairment of her right arm and carpal tunnel syndrome of her left hand. She appeals the denial of her claim for disability benefits.

I. BACKGROUND

A. Procedural History

On May 17, 1999, Connor applied for Disability Insurance Benefits for herself, and Child Insurance Benefits for her twelve year old son, retroactive to December 18, 1998, when she suffered a fall.

The Social Security Administration denied Connor's application for benefits originally and upon reconsideration. Connor requested a hearing before an administrative law judge (ALJ). That hearing was held on September 23, 2000.

On November 7, 2000, the ALJ issued a decision denying Connor's application for benefits. The ALJ found Connor to have a "severe impairment encompassing the entire right upper extremity" and a non-severe impairment of carpal tunnel syndrome of her left hand. The ALJ determined that as a result of these impairments Connor was unable to resume [*2] her past work as elementary school music teacher, secretary, and retail clerk. However, he decided that Connor was not disabled because she was still able to perform other substantial gainful activity as a receptionist, information clerk, shipping and receiving clerk, and inventory clerk.

Connor appealed the ALJ's decision on November 8, 2000. On November 6, 2001, the Appeals Council denied review, rendering the decision of the ALJ the final decision of the Commissioner.

On January 2, 2002, Connor initiated this disability appeal. The parties filed cross motions for summary judgment, which we referred to United States Magistrate Judge Jacob P. Hart. On August 5, 2002, Judge Hart issued a Report and Recommendation recommending that we grant summary judgment to the Commissioner. Connor filed Objections thereto. We review the objected to parts of the Report and Recommendation de novo.

B. Factual Background

As of the administrative law hearing on September 23, 2000, Connor was fifty-three years old and resided in a house with her husband and two sons. R. at 34. As of December 18, 1998, she had worked thirty-three years. Her past relevant work was as a secretary, retail clerk, [*3] and elementary school music teacher. n1 R. at 99, 118. She was working as an elementary school music teacher when, on December 18, 1998, she slipped and fell down four concrete steps, landing on her outstretched right arm. Connor was taken to the Presbyterian Medical Center Emergency Department, where X-rays of her right elbow

Case 1:06-cv-00165-GMS    Document 32-4    Filed 01/12/2007    Page 3 of 8

Page 2

2003 U.S. Dist. LEXIS 143, *; 85 Soc. Sec. Rep. Service 176

revealed a comminuted radial head fracture. n2 She was splinted and referred for surgery. R. at 155-62.

n1 Past relevant work under the Social Security Act is the work the claimant has performed in the past fifteen years. See *20 C.F.R. § 404.1565(a)*.

n2 The radius is one of the two bones of the forearm. Comminuted means "broken into several pieces." Stedman's Medical Dictionary at 386, A15, 1506 (27th ed. 2000).

On December 31, 1998, Dr. Zelouf, an orthopedic surgeon at the Philadelphia Hand Center, conducted exploratory and reconstructive surgery of the right elbow. Dr. Zelouf made an incision of the elbow and observed that:

Immediately [*4] evident was complete stripping of all of the soft tissues from the lateral aspect of the elbow at the time of injury. The elbow was also noted to be markedly unstable, and it was clear that she had sustained an elbow dislocation as well as a complex radial head fracture. The elbow joint was visualized, and the radial head was inspected. 50% of the radial head was fractured and was completely comminuted and not repairable. In addition, the remaining portion of the radial head was fractured at the neck and was similarly unstable. This fracture was deemed nonrepairable. ...Unfortunately, there was significant medial instability indicating disruption of the medial collateral ligament as well as the lateral ligamentous complex contributing to the marked instability of the elbow. ...

R. at 164.

Dr. Zelouf removed Connor's radial head and replaced it with a titanium implant. He removed loose fragments and reconstructed the surrounding ligaments. R. at 164-65.

Connor remained in Dr. Zelouf's care for six months following the surgery. Dr. Zelouf was disappointed with Connor's post-operative progress because he found that recovery was hindered by the formation of heterotopic ossification, [*5] or bone spurs, in the elbow. Dr. Zelouf also noted mild subluxation, or a partial dislocation, of the elbow. Lastly, Dr. Zelouf observed that Connor appeared to be developing carpal tunnel syndrome in the median distribution of her left hand.

Connor participated in physical therapy. For her left hand, Dr. Zelouf recommended a wrist splint and, if symptoms persisted, a corticosteroid injection. But by June of 1999, Dr. Zelouf opined that Connor's right arm had reached its "maximum medical benefit", and without further surgery would remain significantly restricted. Connor opposed further surgery, and she has not had it to date. Dr. Zelouf referred Connor for a functional capacity assessment. R. at 171-79.

Jill Galper of Continuum Healthcare performed a functional capacity assessment on July 28, 1999. Assessing Connor on a variety of activities, Galper found that Connor was severely limited in the motion of her right elbow and forearm and also limited in the motion of her right shoulder. Connor complained of mild tingling and pain in her left hand, brought on by prolonged use of the hand for fine motor activities. These complaints abated with rest. Connor tested as able to carry 7.5 [*6] pounds occasionally and four pounds frequently with both hands, and eighteen pounds occasionally and nine pounds frequently with her left hand. R. at 211-15.

Apparently at the request of Connor's workers' compensation carrier, Connor was evaluated on April 12, 1999 by Dr. Bozentka, an orthopedist of the University of Pennsylvania Health System. Dr. Bozentka diagnosed Connor with elbow contracture with heterotopic ossification of her right elbow, mild adhesive capsulitis with impeachment syndrome of her right shoulder, and carpal tunnel syndrome of her left hand. For the left hand, Dr. Bozentka recommended continued use of the volar wrist splint, and counselled Connor about a corticosteroid injection if symptoms failed to abate. On the right side, Dr. Bozentka discussed with her physical therapy and a subacromial injection for her shoulder, and the benefits and risks of further surgery of the elbow. R. at 191-94.

In August of 1999, Dr. Fried, an orthopedist at the Upper Extremity Institute, assumed Connor's care. Dr. Fried diagnosed Connor with post-contusion right shoulder with residual adhesive capsulitis n3, heterotopic ossification with severe capsular contracture n4 and traumatic [*7] arthrosis n5 of the right elbow, and radial and ulnar neuritis n6 of the right arm. R. at 198. Dr. Fried gave Connor a tape splint for the overuse problem of her left hand. Connor's left hand exhibited symptoms consistent with a progressive median neuropathy and tested positive on the Tinel and Phalen test for carpal tunnel syndrome. R. at 199, 275-76. On December 18, 1999, the last examination on record, Dr. Fried noted improvement in motion of the right shoulder, slight improvement in motion of the right elbow, and decrease in pain. Dr. Fried

Case 1:06-cv-00165-GMS    Document 32-4    Filed 01/12/2007    Page 4 of 8

Page 3
2003 U.S. Dist. LEXIS 143, *; 85 Soc. Sec. Rep. Service 176

resolved to focus further attention in the future to the nerve problems affecting Connor's right arm and back. R. at 197, 275-77. Dr. Fried charted a "conservative" course, advocating continued physical therapy, and opining that even with further surgery the motion of the right elbow would likely remain severely limited. R. at 198-99, 276.

n3 Adhesive capsulitis is "a condition in which there is limitation of motion in a joint due to inflammatory thickening of the capsule, a common cause of stiffness in the shoulder. SYN frozen shoulder." Stedman's Medical Dictionary, supra note 2, at 281-82.

[*8]

n4 Contracture is "static muscle shortening" caused by, inter alia, "loss of motion of the adjacent joint." Id. at 405.

n5 Arthrosis is defined as synonymous with osteoarthritis, which is "arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned...; pain and loss of function result...." Id. at 151, 1282.

n6 Neuritis is inflammation of nerves, id. at 1207, 1211, and the ulna and radius are the bones of the forearm.

On January 3, 2000, Dr. Fried performed a functional capacity assessment, finding that Connor could lift/carry up to five pounds with her right hand and ten with her left hand, and that pain on both sides was a limiting factor in such activities as lifting/carrying, repetitive pushing and pulling, and repetitive pinching. On a job simulation with handwriting test, after seven minutes Connor had "pulling pain in the anterior shoulder and the posterior aspect of the elbow and forearm" of her right arm. Dr. Fried concluded that Connor "showed the ability [*9] to work at a sedentary work level. She does remain symptomatic and has significant limitations. It is recommended that she work at a self paced level and avoid overhead and repetitive activities especially on the right hand side." R. at 281-92.

On September 29, 1999, an agency physician (we cannot decipher the name) performed a functional capacity assessment. The physician identified the same impairments Connor's other physicians diagnosed. He found that Connor was restricted in reaching in all directions and fingering/fine manipulation. He also found that she was

prohibited from repetitive crawling. The agency physician certified Connor able to perform work at the light exertional level, except that "work above the shoulder level as well as repetitive use of RUE [right upper extremity] [is] compromised/precluded." R. at 204-09.

At the hearing on September 27, 2000, Connor could not raise her right arm to take the oath. She testified that she is unable to straighten the arm or turn it over. R. at 33, 39, 44. She and her husband testified that she is unable to wash dishes, cut salad or meat, open a jar, or make a bed. Her husband and sons help with housework. R. at 39, 44, 46-47, 52. [*10] Connor testified that she experiences numbness and tingling of her left hand, but nevertheless relies on that hand to perform daily activities, including eating and driving. R. at 40-41, 46-47. Connor testified that she feels some degree of pain in her right arm all the time and keeps her right arm elevated, even when sleeping, to alleviate pain and swelling. R. at 41-44, 47.

On November 6, 2000, the ALJ issued a disability decision. The ALJ determined that Connor had "a severe impairment encompassing the entire right upper extremity" and the non-severe impairment of carpal tunnel syndrome in her left hand. R. at 13, 17. n7 The ALJ also decided that Connor's "allegations of pain, swelling, tenderness, coldness, numbness, weakness, and loss of attention and concentration are not substantiated to the degree alleged and are thus not fully credible." R. at 17.

n7 The ALJ found other non-severe impairments, including hydradentis, diabetes and obesity, but because Connor does not challenge the ALJ's decision with respect to these impairments we do not discuss them here.

[*11]

At the hearing, the ALJ presented a hypothetical question to the vocational expert, embodying the functional limitations he determined Connor to have, in order to ascertain whether she is able, in light of her education, work experience, and age, to engage in any substantial gainful activity. The hypothetical question was:

If you were to assume a hypothetical individual with the identical vocational profile as that of the claimant and assume the individual was capable of work at the light exertional level. Would require a sit/stand option. And I'll go through the details with respect to the right upper extremities. But the conclusion is that there is very little ability to use that extremity.

2003 U.S. Dist. LEXIS 143, *; 85 Soc. Sec. Rep. Service 176

The push/pull motion of the right arm would be limited. Reaching in all directions would be limited. Gross and fine manipulations would be limited. Postural movements could be done only on an occasional basis. He or she would have to avoid temperature extremes. And in this particular instance a job would have to allow for not only the sit/stand option, but while seated some type of device that would cushion the right arm while in the seated position. Now, first, given those limitations [*12] do you see, do you have an opinion with regard to the ability to perform any of the past relevant work? ... Then the next question is are there jobs in the regional or national economy available to the person with the limitations I've described?

R. at 57-58.

The vocational expert responded that one with the functional restrictions cited above would be unable to return to work as a music teacher, retail clerk, or secretary, because such jobs involve both arms. There are, however, other jobs in the regional and national economy that such a person could perform that require "some use of one, but certainly not two" arms and "might require the use of one arm to do certain things like answer the phone or take some brief messages". Those jobs include receptionist, information clerk, shipping and receiving clerk, and inventory clerk. R. at 58-59.

Based on the vocational expert's testimony, the ALJ concluded that Connor was unable to resume her former work, but was able, despite her impairments, to work as a receptionist, information clerk, shipping and receiving clerk, and inventory clerk, and accordingly determined that she was not disabled.

II. DISCUSSION

A. Applicable [*13] Law

A claimant establishes a disability under the Social Security Act if she demonstrates that she is unable to engage in any substantial gainful activity by reason of a medically determinable impairment or combination of impairments that lasts for at least twelve months. *Fargnoli v. Massanari, 247 F.3d 34, 38-39 (3d Cir. 2001); 42 U.S.C. § 423*(d)(1).

The Commissioner uses a sequential five-step disability assessment process:

In step one, the Commissioner must

determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.]1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. *20 C.F.R. § 404.1520(c)*. If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. *20 C.F.R. § 404.1520(d)* [*14] . If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. *20 C.F.R. § 404.1520(d)*. The claimant bears the burden of demonstrating an inability to return to her past relevant work.

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. [HN5] At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. *20 C.F.R. § 404.1520(f)*. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See *20 C.F.R. § 404.1523* [*15] . The ALJ will often seek the assistance of a vocational expert at this fifth step.

*Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999)*, quoted in *Fargnoli, 247 F.3d at 39* (some citations omitted)). See also *20 C.F.R. § 404.1520*.

Here, the ALJ denied Connor's disability claim at step

Case 1:06-cv-00165-GMS    Document 32-4    Filed 01/12/2007    Page 6 of 8

Page 5

2003 U.S. Dist. LEXIS 143, *; 85 Soc. Sec. Rep. Service 176

five, finding that although she was unable to return to her former work, she was able despite her impairments to perform other substantial gainful activity as an inventory clerk, information clerk, shipping and receiving clerk, and receptionist. We note that once a claimant shows that she is precluded by her impairments from resuming her former work activity, as Connor has done, the burden shifts to the Commissioner to show that there is other work activity in the regional or national economy that the claimant can perform. *Id. 247 F.3d at 39; Bowen v. Yuckert, 482 U.S. 137, 145 n.5, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).*

We review the factual findings of the ALJ under a substantial evidence standard. *42 U.S.C. § 405(g).* Substantial evidence is "such relevant evidence as a reasonable [*16] mind might accept as adequate." *Fargnoli, 247 F.3d at 38.* The overriding question on this appeal is whether the determination of the ALJ that Connor was able to perform other substantial gainful activity was supported by substantial evidence, or adequate to a reasonable mind.

B. Analysis

We find that the ALJ erred in three respects and, as a result, his decision that Connor was not disabled -- in that she was able to engage in other substantial activity -- is not supported by substantial evidence. First, the ALJ erred in disregarding Connor's consistent and medically substantiated complaints of pain. Second, the ALJ failed to take into account the vocational restrictions imposed by the carpal tunnel syndrome of Connor's left hand. Third and similarly, when assessing Connor's vocational capacity, the ALJ neglected to consider that the severe impairment affected Connor's dominant hand.

First, the ALJ erred in declining to credit Connor's allegations of pain, swelling, tenderness, and loss of concentration, R. at 17. Connor testified in the administrative hearing that pain affects her right arm all of the time and ranges from a "banging" to a more usual "extra [*17] heavy" feeling. She testified that the pain has become a distraction. She also testified that the pain increases with activity and temperature extremes and that she keeps the right arm elevated to alleviate discomfort and swelling. R. at 41-49.

Connor's testimony is consistent with that of her husband and with her statements to her treating and examining physicians. It is also supported by medical evidence. For instance, Connor was diagnosed with bone spurs impinging on her elbow joint and ulnar and radial neuritis. Pain management is an objective resonating throughout Connor's treatment history, including her last examination by Dr. Fried in which Dr. Fried still cited the need to reduce Connor's pain and resolved to focus greater attention on her nerve problems, R. at 276. On January 3

and 15, 2000, when Dr. Fried conducted a functional capacity test and filled out the forms sent by the agency, he noted pain to be a factor limiting Connor's performance on such activities as pushing/pulling, carrying, and writing, and frequently to impair Connor's concentration. R. at 281-92. Finally, the agency physician who examined Connor to assess her functional capacity noted significant tenderness [*18] of Connor's right elbow and shoulder and that she appeared to hold her right arm in a "guarded position". R. at 203-04.

The ALJ must give due weight to all of a claimant's impairment-related symptoms, including pain. See *20 C.F.R. § 404.1529.* Additionally, as our Court of Appeals has explained, a claimant's attestations of pain are entitled to "serious consideration", and if supported by medical evidence are entitled to "great weight" and may only be disregarded if there is contrary medical evidence on record. *Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).* The ALJ cites none, and thus his decision to disregard complaints of pain is not supported by substantial evidence. n8

> n8 The ALJ mentions that Connor "does not take medications indicated for the treatment of severe pain and has not produced records corroborative of participation in a pain management program." R. at 16. In addition to being insufficient to refute medical evidence of pain, under Mason this reasoning is not persuasive in light of the record as a whole. Connor did participate in a pain management program. On August 16, 1999, Dr. Fried said "I feel she would benefit from a pain management person being on board" and on September 20, 1999, Connor went to MossRehab for pain management. R. at 199, 217-19. Furthermore, Connor used narcotic pain medication, such as Percocet, but tapered off due, in whole or part, to fear of addiction. Connor has gastro-intestinal intolerance to anti-inflammatory medication. R. at 41, 47-48, 51, 174, 196, 219.

[*19]

The ALJ correctly took into account that Connor needs a job in which her right arm can be elevated. But he erred in declining to consider the functional restrictions the pain itself posed, as well as the effect of the pain on Connor's concentration, persistence, and pace, and the evidence that the pain increases with right-arm activity.

Second, the ALJ erred in failing to consider the functional limitations posed by the carpal tunnel syndrome of Connor's left arm. The ALJ found Connor to have carpal tunnel syndrome in her left hand, a finding every doctor

2003 U.S. Dist. LEXIS 143, *; 85 Soc. Sec. Rep. Service 176

who examined Connor shared.

The ALJ also found that carpal tunnel syndrome was an impairment that was non-severe. This finding was justified. An impairment is non-severe if "it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The left carpal tunnel syndrome did not appear to reduce Connor's range of motion or strength. What it amounted to was coldness, numbness, and tingling of the fingertips of her left hand, and pain, upon repeated use, of her left palm. The ALJ was entitled to find that this impairment of Connor's non-dominant arm [*20] did not significantly limit the ability to perform basic work activities.

Nevertheless, the ALJ committed reversible error by failing to consider the vocational effects of this non-severe impairment. Once a claimant is found to have a severe impairment, the ALJ must consider the functional limitations posed by all of the claimant's impairments, including those that are not severe, in assessing the claimant's functional capacity to engage in work. See 20 C.F.R. § 416.945(e); 20 C.F.R. § 416.923. This case dramatizes why. Carpal tunnel syndrome of one's non-dominant hand may ordinarily not be disabling, but when considered in combination with a severe impairment of the other hand, it may very well be.

The ALJ posed a hypothetical question to the vocational expert at the hearing that did not mention any functional restriction of Connor's left hand. See supra Part I.B. The ALJ also specified Connor's functional limitations in his written decision and did not mention any attributable to carpal tunnel syndrome, see R. at 17, P 5. A hypothetical question to a vocational expert must embody all of the claimant's impairments. [*21] If it does not, the answer to the hypothetical question is not supported by substantial evidence. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Morales v. Apfel, 225 F.3d 310, 319, 320 (3d Cir. 2000). Because the ALJ determined that Connor was able to engage in substantial gainful activity based upon the answer to a hypothetical question that did not reflect left carpal tunnel syndrome, the decision is not supported by substantial evidence.

The ALJ should have assessed Connor's ability to engage in substantial gainful activity in light of all her impairments, including carpal tunnel syndrome of her left hand. The symptoms of carpal tunnel syndrome included numbness and tingling of her fingertips and pain, upon repeated use, of the palm, of her left hand.

Finally, the ALJ neglected to specify to the vocational expert that Connor can only write with her right hand. But the vocational expert seemed to view her as ambidextrous. The vocational expert deemed Connor able to perform work as a receptionist, information clerk, shipping and receiving clerk, and inventory clerk because these jobs require use of only one hand, Connor's left hand. The other [*22] hand would remain elevated on a pillow. This testimony of the vocational expert that Connor is able to perform these jobs ignores the fact that all of them involve writing n9, and Connor can only write with her right hand. It is unclear how Connor can do any of these jobs when her right arm is severely restricted (as the ALJ put it, "there is very little ability to use that extremity") and supposed to be elevated on a pillow. For this reason as well, the finding of the ALJ that Connor is able to work as an inventory clerk, information clerk, shipping and receiving clerk, and receptionist is not supported by substantial evidence.

n9 The vocational expert testified they involve writing. See supra Part I.B. See also O*NET, the Occupational Informational Network that is the online replacement of the Dictionary of Occupational Titles (DOT), listing tasks for these jobs as including recording information and preparing documents. See O*NET, available at http://www.onetcenter.org/overview.html. The positions we examined are Receptionists and Information Clerks (O*NET 43-4171.00), Shipping, Receiving, and Traffic Clerks (O*NET 43-5071.00), and Stock Clerks-Stockroom, Warehouse, or Storage Yard (43-5081.03), the position listed as the most similar to "inventory clerks".

[*23]

On remand, the ALJ should consider the functional ramifications of all of Connor's impairments, including left carpal tunnel syndrome, ascribe proper weight to Connor's complaints of pain, and bear in mind that the severe impairment affects Connor's dominant extremity.

ORDER

AND NOW, this 6th day of January, 2003, upon consideration of the parties' cross motions for summary judgment, the Report and Recommendation of United States Magistrate Judge Jacob P. Hart, and plaintiff's Objections thereto, in accordance with the Memorandum issued this day, it is hereby ORDERED that:

1. Plaintiff's objections are SUSTAINED;

2. The Report and Recommendation is DISAPPROVED;

3. Plaintiff's motion for summary judgment is GRANTED insofar as the matter is remanded for further proceedings consistent with the Memorandum; and

4. Defendant's motion for summary judgment is

2003 U.S. Dist. LEXIS 143, *; 85 Soc. Sec. Rep. Service 176

DENIED.

BY THE COURT:

Stewart Dalzell, J.

JUDGMENT

AND NOW, this 6th day of January, 2003, the Court having by Memorandum and Order issued this day (1) disapproved the Report and Recommendation of Magistrate Judge Hart, (2) granted in part plaintiff's motion for summary judgment, and (3) denied defendant's motion for [*24] summary judgment, in accordance with *Shalala v. Schaefer, 509 U.S. 292, 113 S. Ct. 2625, 125 L. Ed. 2d 239 (1993)* and *Kadelski v. Sullivan, 30 F.3d 399 (3d Cir.*

*1994)*, it is hereby ORDERED that:

1. JUDGMENT IS ENTERED in favor of plaintiff Sandra L. Connor and against defendant Jo Anne B. Barnhart;

2. The case is REMANDED to the Commissioner of Social Security for further proceedings consistent with the Memorandum; and

3. The Clerk shall CLOSE this civil action statistically.

BY THE COURT:

Stewart Dalzell, J.

## CERTIFICATE OF SERVICE

I, **Eric M. Anderson, Esq.** of Marks, O'Neill, O'Brien & Courtney, P.C. hereby certify that on this

**12**th day of **January**, 2007, I served Defendant's **Reply Brief in Support of Defendant's Motion to Compel**

by electronic filing in the above matter upon the following counsel of record:

> Kevin William Gibson, Esquire
> Gibson & Perkins, P.C.
> 200 East State Street, #105
> Media, PA 19063

 

 

 

                                        */s/ Eric M. Anderson*
                                        Eric M. Anderson

DE074165.1